Robert KINKEAD and Virginia Kinkead
*v.* UNION NATIONAL BANK

CA 94-534                                               907 S.W.2d 154

Court of Appeals of Arkansas
Division II
Opinion delivered October 4, 1995

6

8

*Joyce Kinkead*, for appellants.

*Allen Law Firm*, by: *J. William Allen* and *Sandra Jackson*, for appellee.

JOHN MAUZY PITTMAN, Judge. This appeal is from a judgment entered by the Pulaski County Chancery Court that awarded appellee judgment on its complaint for foreclosure and also granted it judgment on all counts of the appellants' counterclaim. Appellants assert eleven points on appeal. We find these points to be without merit and affirm.

In 1991, appellant Robert Kinkead owned an insurance agency known as the Kinkead Agency. Appellee, Union National Bank, made available financing to Kinkead's insurance customers

for their insurance premiums. Under this arrangement, Kinkead submitted premium finance notes signed by the insured and guaranteed by the Kinkead Agency to Union. Union then disbursed the loan proceeds to the Kinkead Agency to be used to pay the insurance companies writing the policies.

In July 1991, Union officials contacted Mr. Kinkead and set a meeting date after it discovered that some of the premium finance notes from the Kinkead agency were fraudulent. Neither Kinkead nor his wife, appellant Virginia Kinkead, attended the meeting or any of the subsequent meetings with the Union officials relating to this matter. Instead, attorney Webster Hubbell appeared on behalf of Kinkead but stated that he was there as a friend and not as an attorney. After the first meeting, it was decided that Kinkead would be given some time to arrange financing to pay off the notes owed to Union.

Kinkead was unable to procure outside financing, and at Hubbell's request, Union agreed to refinance the money it was owed secured by certain collateral. Union then sent Hubbell loan documents for appellants' execution which included a promissory note in the amount of $96,324.00; a mortgage on real property owned by appellants; and a collateral assignment of a contract for sale between Mr. Kinkead and Stevens-Dell & Associates, Inc. Before appellants executed the loan documents and mortgage, Union filed a criminal referral form regarding Kinkead's fraud as required by 12 C.F.R. § 21.11. Neither Kinkead nor Hubbell was notified that the criminal referral would be filed. The note and mortgages were signed by both appellants on November 21, 1991. On July 15, 1992, Kinkead pled guilty to bank fraud, and at the pre-sentencing hearing, Kinkead's attorney represented to the court that Kinkead had made restitution to Union by virtue of the November 21, 1991, note.

On October 15, 1992, Union filed its foreclosure action, contending that appellants failed to make the March 21, 1992, payment due on their note or any other payments required by the note thereafter. Appellants responded and counterclaimed. The central thrust of their counterclaim was that Union induced them to execute the promissory note and mortgages by representing that no criminal action would be taken against Robert Kinkead if the notes were paid by refinancing. They alleged misrepre-

sentation, breach of fiduciary duty, failure to make disclosures required by the Truth-in-Lending Act, and malice, and requested that the note, mortgages, and collateral agreement be rescinded; that all payments made on such note be returned to them; and that they be awarded punitive damages in the amount of $3,000,000.00. Union denied appellants' allegations, and it affirmatively pled that the Truth-in-Lending Act did not apply to Union's transaction with appellants; that the counterclaim failed to state facts upon which relief could be granted; and that the Kinkeads were barred from seeking relief under the doctrine of unclean hands. The matter proceeded to trial, at the conclusion of which the court granted appellee judgment on its complaint and all counts of appellants' counterclaim and awarded attorney's fees of $47,995.95. Appellants petitioned the court to amend its judgment, but that motion was deemed denied after thirty days. Appellants then filed their notice of appeal.

Appellants first contend that, because they sought punitive damages from appellee in their counterclaim, the chancellor erred in refusing to sever their counterclaim from appellee's foreclosure action and transfer it to circuit court. In support of their argument, they rely on Rule 18(b) of the Arkansas Rules of Civil Procedure, which provides that "[t]he trial court may make appropriate orders affecting severance of claims and may transfer claims between courts of law and equity on appropriate jurisdictional grounds." Appellants also rely on *Toney* v. *Haskins*, 7 Ark. App. 98, 109, 644 S.W.2d 622, 628 (1983), where this court stated: "Equity will not ordinarily enforce penalties and it has been held that one who appeals to a court of equity for relief waives the award of punitive damages as a matter of right."

Although we agree that the chancellor has the power to sever and transfer a claim in an appropriate situation, we find no error in his failure to do so in this case. Regardless of whether a party is entitled to bring an action at law, the mere existence of that right does not deprive the equity court of jurisdiction, unless the legal remedy is clear, adequate, and complete. *Weathersbee* v. *Wallace*, 14 Ark. App. 174, 686 S.W.2d 447 (1985). Here, appellants' counterclaim sought rescission of the promissory note, mortgages, and collateral agreement based on their allegation of fraud and violation of the Truth-in-Lending Act. An action to rescind under the Truth-in-Lending Act is an equi-

table proceeding. *See Bank of Evening Shade* v. *Lindsey*, 278 Ark. 132, 644 S.W.2d 920 (1983). Once a chancery court acquires jurisdiction for one purpose, it may decide all other issues. *Pryor* v. *Hot Spring County Chancery Court*, 303 Ark. 630, 799 S.W.2d 524 (1990); *see Bright* v. *Gass*, 38 Ark. App. 71, 831 S.W.2d 149 (1992).

Appellants' second point concerns the chancellor's refusal to compel Union Bank officials and its former attorney, David Duke, to testify regarding conversations that they held concerning the filing of the criminal referral. During depositions and at trial, appellee asserted that the attorney-client privilege protected these communications from disclosure to appellants. Appellants first contend that appellee did not meet its burden of showing the privilege applied. We disagree.

Rule 502(b) of the Arkansas Rules of Evidence generally provides that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential . . . communications made for the purpose of facilitating the rendition of professional legal services to the client . . . between himself or his representative and his lawyer or his lawyer's representative. . . ." An attorney is incompetent to testify concerning any communication made to him by his clients, or his advice thereon, without his client's consent, and the rule as to privileged communications between attorney and client extends to statements of each to the other. *See Norton* v. *Norton*, 227 Ark. 799, 302 S.W.2d 78 (1957). The burden of showing that a privilege applies is upon the party asserting it. *Shankle* v. *State*, 309 Ark. 40, 827 S.W.2d 642 (1992).

At trial, Union's former attorney, Mr. Duke, acknowledged that the criminal referral form was discussed at meetings he held with Union officials and provided appellants with the dates of those meetings. Duke also testified that he was involved as a lawyer for Union and that he met with Union officials concerning the Kinkead matter. We find that this testimony was sufficient for appellee to meet its burden of showing that the privilege applied.

In regard to these same communications, appellants next argue that the communications were excepted from the attorney-client privilege because Arkansas Rule of Evidence 502(d)(1)

provides an exception to the attorney-client privilege if the communication is in furtherance of the crime of fraud. Appellants contend that Duke and the Union officials conspired to commit a fraud by delaying the filing of the criminal referral form from late July 1991 until October 14, 1991. Under 12 C.F.R. 21.11 (1995), a national bank is required to "file an OCC Criminal Referral Form . . . for any known or suspected criminal violation no later than thirty days after detection of the loss or known or suspected criminal violation." Appellants argue that appellee's delay in filing a criminal referral form was a violation of 18 U.S.C. § 371 and 18 U.S.C. § 1005.

We need not discuss these code sections because appellants have not provided this court with any citation to authority or convincing argument explaining how these code sections are applicable to this case. An assignment of error unsupported by convincing argument or authority will not be considered on appeal unless it is apparent without further research that the assignment of error is well taken. *Smith* v. *Smith*, 41 Ark. App. 29, 848 S.W.2d 428 (1993); *General Elec. Supply Co.* v. *Downtown Church of Christ*, 24 Ark. App. 1, 746 S.W.2d 386 (1988).

Appellants' final argument concerning the attorney-client privilege is that appellee waived its right to assert its attorney-client privilege when it filed the criminal referral form, discussed the matter with the FBI, and produced a copy of the form for appellants in response to their motion for production of documents. We disagree. It is not the information or the opinion that is privileged, but rather the communication of them to the attorney in whatever form, and neither the requirement that the information also be provided to some other forum nor its divulgence in response will subvert the privilege. *Courteau* v. *St. Paul Fire & Marine Ins. Co.*, 307 Ark. 513, 821 S.W.2d 45 (1991).

For their third point, appellants contend that the trial court erred in striking their second amended counterclaim, which added a claim based on the Equal Credit Opportunity Act and sought $10,000.00 in actual damages and punitive damages of $4,335,000.00. Rule 15(a) of the Arkansas Rules of Civil Procedure provides that amendments to pleadings shall be allowed in nearly all instances without special permission from the court *except where, on motion of an opposing party, the court deter-*

*mines either that prejudice would result or that disposition of the cause would be unduly delayed, in which case the court may strike such amended pleading.* See *Odaware v. Robertson Arial-AG, Inc.,* 13 Ark. App. 285, 683 S.W.2d 624 (1985). The trial court is vested with broad discretion in allowing or denying amendments. *See Cawood v. Smith,* 310 Ark. 619, 839 S.W.2d 208 (1992). Here, the pleading was not filed until the day before the trial on the merits of this case began. Appellee argued that the inclusion of this claim at such a late date would require substantial additional research and discovery and would unduly delay the trial, which already had been twice rescheduled. We cannot find that the chancellor erred in holding that appellants' pleading was untimely and would result in prejudice to appellee.

Appellants' fourth point concerns the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* This Act requires a lender to give written notice to the borrower that he has three days following any transaction that results in a mortgage on real property to notify the creditor that he elects to cancel, and, if the notice is not given, the right to cancel continues. *See Bank of Evening Shade v. Lindsey,* 278 Ark. 132, 644 S.W.2d 920 (1983). In this case, the disclosures under the Act were dated November 21, 1991, but they were not sent for appellants' signature until November 27, 1991, one day after the three-day expiration period. Appellants therefore argue that the note, mortgage, and collateral agreement should be rescinded because Union did not timely send disclosures as required by the Truth-in-Lending Act.

The chancellor held that the Truth-in-Lending Act was not applicable after finding that all the transactions that led to the lawsuit were of a business nature and not a consumer or personal loan. Business loans are exempted from the Truth-in-Lending Act. *See id.* Appellants contend the chancellor's finding that the subject transactions were of a business nature is in error because the undisputed evidence showed Kinkead used the money he obtained from the fraudulent notes for personal expenses.

It is the use of the money, property, or services that is the subject of any underlying credit transaction, and not the nature of the property given as security nor the subjective motivation of the mortgagor, that determines whether the credit transaction is exempt from the requirements of the federal Truth-in-

Lending Laws. *See Sims* v. *First Nat'l Bank*, 267 Ark. 253, 590 S.W.2d 270 (1979). Where the evidence establishes that the proceeds of a loan were applied primarily to retire a business debt and purchase inventory, the loan is exempt from the Truth-in-Lending Act, and the fact that some checks may have been drawn on the account for personal purposes does not change the nature of the loan at the time it was made. *See Winkle* v. *Grand Nat'l Bank*, 267 Ark. 123, 601 S.W.2d 559 (1980), *cert. denied*, 449 U.S. 880 (1980).

██ ██ Here, Leslie Wilfong, a Union official, testified that the $96,000.00 promissory note was made to appellants for the purpose of refinancing loans made to the Kinkead's insurance agency. Even though Kinkead testified that he used funds from the fraudulent notes for his personal use, he represented to the bank that the loans were to be used to finance insurance premiums, and the proceeds from these loans were sent to The Kinkead Agency. "A lender should be able to rely on the sworn statement of a borrower as to his intended use of the loan proceeds. . . ." *Briggs* v. *Capital Sav. & Loan Ass'n*, 268 Ark. 527, 531, 597 S.W.2d 600, 603 (1980). An appellate court attaches substantial weight to the chancellor's findings, and while the appellate court considers the evidence on a chancery appeal *de novo*, it will not reverse the chancellor unless it is shown that the lower court decision is clearly contrary to a preponderance of the evidence. *Id.* We cannot say that the chancellor's finding that the transactions in question were of a business nature is clearly against the preponderance of the evidence.

Appellants' points 5, 7, and 8 all concern the chancellor's holding that appellee did not have a duty to disclose to appellants that it was required to file a criminal referral form and that a criminal referral form was in fact filed. Appellants argue that appellee's failure to advise them that it was required to file the criminal referral form clearly demonstrates bad faith, breach of trust, and breach of fiduciary duty, and that appellee protected its own interests to the detriment of appellants.

In support of their argument, appellants cite *Union National Bank of Little Rock* v. *Farmers Bank*, 786 F.2d 881, 887 (8th Cir. 1986), where the court stated:

Under Arkansas law, a party may have an obligation to

speak rather than remain silent, when a failure to speak is the equivalent of fraudulent concealment. Such a duty of disclosure arises only where special circumstances exist. The duty arises "where one person is in position to have and to exercise influence over another who reposes confidence in him whether a fiduciary relationship in the strict sense of the term exists between them or not." Absent such special circumstance, or affirmative fraud, a party must seek out the information it desires; it may not omit inquiry and examination and then complain that the other did not volunteer information.

*Id.* at 887 (quoting *Hanson Motor Co.* v. *Young*, 223 Ark. 191, 196, 265 S.W.2d 501, 504 (1954)) (citations omitted).

Although appellants argue that special circumstances existed here that created a duty of disclosure, they do not describe what those circumstances were. This court held in *Marsh* v. *National Bank of Commerce*, 37 Ark. App. 41, 822 S.W.2d 404 (1992), that generally the relationship between a bank and the customer is merely that of debtor and creditor and that the party claiming the existence of a confidential relationship has the burden of proving it.

Appellants also argue that Union's delay in filing the criminal referral form and its foreclosure action demonstrate a breach of trust, breach of fiduciary duty, and bad faith. Specifically, appellants point out that, although Union filed the criminal referral form more than a month before appellants executed their note, mortgage, and collateral agreement to Union, Union made sure "it was 'fully collateralized' before any law enforcement agency had time to act" and that Union waited until after appellant was sentenced for his fraud conviction before it filed its foreclosure action.

Appellee admittedly did seek to protect its own interests through its actions. Nevertheless, appellants have not shown that those actions breached any duty owed to appellants or constituted bad faith. Appellants were represented by Webster Hubbell, who testified that he thought Kinkead had committed a crime, that he had contacted a criminal attorney, and that he never questioned Union officials regarding any criminal consequences. He also testified he had no reason to believe that Union had not

dealt with appellees in good faith. The chancellor found that the parties dealt at arm's length and that appellee did not owe them any fiduciary duty. From our review of the evidence, we cannot say these findings are clearly erroneous.

Also in connection with the criminal referral form, appellants contend that the chancellor erroneously determined that there was no evidence to support their allegations that David Duke and Union officials conspired to withhold information from appellants in order to coerce appellants to execute the note, mortgage, and other collateral in favor of appellee. We find no merit to this argument, as we have affirmed the chancellor's holding that appellee did not have a duty to disclose to appellants that it was required to file the criminal referral form.

For their sixth point, appellants argue that the chancellor erred in finding that there was no evidence presented to show that Union acted with malice or reckless disregard as they alleged in count four. Count four involved appellants' allegation that Union intentionally overstated the amount that was included in appellants' promissory note and that it included sums from notes that were not in default nor "improper," including appraisal costs, attorney's fees, and title fees. Appellants also contend that Union did not advise them what made up the amounts included in the note until approximately one month after they signed the note and that Union returned payments it received from Kinkead's insureds on the notes that were not obtained by fraud to the insureds rather than crediting them to the Kinkeads' note. We agree that no evidence was presented to the trial court to support their complaint.

The undisputed evidence demonstrates that Union was following the directions given it by Hubbell, appellants' agent, in preparing the note and other collateral. Leslie Wilfong testified that Hubbell decided what the amount of the monthly payment on the note would be, the seventeen-year amortization, and the collateral that would secure the note. Another Union official, Robert Whisnant, testified that, with regard to the amount of the note, Hubbell told him to include all of the notes and late charges in the note balance regardless of whether they were procured by fraud. This testimony was not disputed by Hubbell. There was also evidence that a breakdown of the note was provided to appel-

lants in December 1991, that they then made several payments on the note after the breakdown was provided, and that it was not until July 1992 that appellants first questioned the amount of the note with appellee. Silence or acquiescence in the contract for any considerable length of time amounts to ratification. *Sims v. First Nat'l Bank,* 267 Ark. 253, 590 S.W.2d 270 (1979).

Appellants also allege that Union made false representations that induced them to enter into the note and mortgage. Specifically, appellants assert that Hubbell told Kinkead on numerous occasions that he did not think a criminal charge would be filed against Kinkead if he repaid the fraudulent notes. There is no evidence, however, that any such representations were made to Hubbell or appellants by Union officials or its attorneys. In fact, Hubbell admitted in his deposition that no such representations were made to him and that he never discussed any criminal charges with the Union officials or its attorney although he thought Kinkead had committed a crime. Appellants admitted that they never had any discussions with Union officials and relied entirely on Hubbell to represent them.

There is also no merit to appellants' claim that Union forced them to pledge their house as collateral. The undisputed evidence at trial was that Hubbell, appellants' agent, offered the mortgage on their house to Union in order to obtain financing to repay the fraudulent loans.

Appellant Virginia Kinkead also argues that the note and mortgage should be set aside as to her because she was not liable on the fraudulent notes to the bank. The supreme court addressed a similar argument in *Sims v. First National Bank, supra:* "A mortgage by a married woman to secure her husband's debts, whether they be existing debts or debts to accrue, is valid and enforceable. Consideration for the mortgage need not pass to the wife as consideration to the husband is sufficient. . . ." 267 Ark. at 263, 590 S.W.2d at 276 (citations omitted).

We do not address appellants' contention that the chancellor erred in holding that over-collateralization is not a defense to the note because appellants have not cited any authority or made a convincing argument in support of this contention. *See Smith v. Smith,* 41 Ark. App. 29, 848 S.W.2d 428 (1993); *General Elec. Supply Co. v. Downtown Church of Christ,* 24 Ark.

App. 1, 3, 746 S.W.2d 386 (1988). Furthermore, the evidence reflected that the amount of collateral Union received on its note was the amount offered by Hubbell on behalf of appellants. Therefore, appellants are not in a position to challenge the amount of collateral appellee obtained from them.

Appellants' ninth point concerns the chancellor's award of $47,995.95 in attorney's fees to appellee. At the conclusion of the trial, appellee's witness Wilfong testified that this amount had been paid by appellee to its attorneys through October 19, 1993. Appellant objected to the court's consideration of attorney's fees and requested a separate hearing. The chancellor denied appellants' request but stated a motion for reconsideration could be filed and ordered appellee to supply appellants with a copy of its billing statements. Appellants then filed a motion to amend the judgment, which was deemed denied after thirty days.

Appellants contend that, even if Union was entitled to receive a reasonable attorney's fee on its foreclosure action, it was not entitled to receive a fee for defending appellants' counterclaim because their claims dealt primarily with federal statutes and tort. The supreme court held in *Stein* v. *Lukas*, 308 Ark. 74, 823 S.W.2d 832 (1992), that the Arkansas fee statute for civil actions does not embrace tort actions such as deceit. Relying on that case, appellants here argue that it was error to award appellee a fee for defending their claims.

We find that *Stein* v. *Lukas, supra,* is not controlling in this fact situation. In that case, the appellant's complaint was brought on theories of deceit and breach of warranty. Here, although appellants made unsubstantiated allegations of tort in their counterclaim, the trial was basically an action for foreclosure. In *Loewer* v. *National Bank of Arkansas*, 311 Ark. 354, 844 S.W.2d 329 (1992), the supreme court affirmed an attorney's fee award of $50,000.00 on a $130,851.00 judgment, where the appellee had sued on two promissory notes and the appellants counterclaimed for set-off of his debt because of the appellee's conversion of his equipment. In that case, the appellants had also questioned the amount of attorney's fees. The supreme court held:

> Loewer also argues recoveries of attorney's fees on promissory notes are limited to 10% of the principal and

interest, relying on Ark. Code Ann. § 4-56-101 (Repl. 1991). This section simply recognizes that a provision in a promissory note for the payment of a reasonable attorney's fee, not to exceed 10% of the amount of principal plus interest, may be enforceable as a contract of indemnity. We cannot interpret the Statute to limit the amount of attorney's fees which can be awarded in an action to recover on a promissory note. Arkansas Code Ann. § 16-22-308 (Supp. 1991) clearly authorizes attorney's fees to be awarded in an action such as this one.

*Id.* at 361, 844 S.W.2d at 334.

In determining a reasonable attorney's fee, the court considers the character of the services, the time and trouble involved, the skill and experience required, the professional character, judgment, and responsibility of the attorney, the result achieved, the attorney's own estimation of the value of his services, and an estimate of other attorneys who are familiar with relevant facts. *See State Farm Fire and Casualty Co. v. Stockton,* 295 Ark. 560, 750 S.W.2d 945 (1988). Considerable weight is given to the opinion of the judge before whom the proceedings have been conducted, *Crockett & Brown, P.A. v. Courson,* 312 Ark. 363, 849 S.W.2d 938 (1993), and an award of an attorney's fee will not be reversed absent an abuse of the trial court's discretion. *See Garner v. Limbocker,* 28 Ark. App. 68, 770 S.W.2d 673 (1989).

Here, appellee furnished appellants and the court with a detailed summary of its billing statement. One counterclaim and two amended counterclaims were filed by appellants, and appellee had to defend against nine causes of action. Numerous depositions were also taken, and the chancellor sat through hearings and one trial. Based on the evidence before him, we cannot say that appellants have shown any abuse in the award of attorney's fees.

Appellants contend in their tenth point that the chancellor erred in holding that the security that they offered was not adequate to stay execution of appellee's entire judgment pending appeal. Inasmuch as we have affirmed the judgment in favor of appellee, the question raised by appellants is now moot, and we decline to address it. *Aldridge v. Aldridge,* 28 Ark. App. 175,

773 S.W.2d 103 (1989); *see Logan v. State*, 299 Ark. 550, 776 S.W.2d 327 (1989).

We also do not address appellants' final point, that the chancellor erred in compelling them to file a schedule under Ark. Code Ann. § 16-66-221, because the schedule was in fact filed by appellants on May 12, 1994.

Affirmed.

ROBBINS and ROGERS, JJ., agree.