# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-1401

_____

Native American Council of Tribes; Blaine Brings Plenty; Clayton Sheldon Creek

*Plaintiffs - Appellees*

v.

Douglas Weber, Warden of the South Dakota State Penitentiary; Dennis Kaemingk, Secretary of the Department of Corrections

*Defendants - Appellants*

------------------------------

United States of America

*Amicus on Behalf of Appellee(s)*

_____

No. 13-2745

_____

Native American Council of Tribes; Blaine Brings Plenty; Clayton Sheldon Creek

*Plaintiffs - Appellees*

v.

Douglas Weber, Warden of the South Dakota State Penitentiary; Dennis Kaemingk, Secretary of the Department of Corrections

*Defendants - Appellants*

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: December 18, 2013
Filed: April 25, 2014

_____

Before BYE, BRIGHT, and SMITH, Circuit Judges.

_____

BRIGHT, Circuit Judge.

In this appeal, we consider the South Dakota Department of Corrections' ("SDDOC") decision to prohibit tobacco use by Native American inmates during religious activities. In 2009, the Native American Council of Tribes ("NACT") and South Dakota Native American inmates Blaine Brings Plenty and Clayton Creek (collectively "inmates")[1] brought suit against prison officials from the SDDOC (collectively "defendants")[2] claiming that the tobacco ban substantially burdened the exercise of their religious beliefs in violation of the Religious Land Use and

---

[1] The complaint named four additional inmates as plaintiffs, all of whom have been dismissed from this action upon release from custody or transfer to a correctional facility outside of South Dakota.

[2] The inmates initially filed suit against Douglas Weber, then Director of Prison Operations for the SDDOC, Timothy Reisch, then Secretary of the SDDOC, and Marty Jackley, the Attorney General of South Dakota, in their official capacities. Dennis Kaemingk has since replaced Reisch as Secretary of the SDDOC, and the district court dismissed Jackley as a defendant. Weber remains a defendant in this suit.

Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1(a). After a three-day bench trial, the district court[3] granted injunctive relief to the inmates and directed the parties confer regarding a revised tobacco policy. On failure to agree, the district court entered a remedial order that, among other things, limited the proportion of tobacco in the mixture distributed to inmates for religious purposes to no more than one percent. The defendants appeal the grant of injunctive relief, including the remedial order. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## II.  BACKGROUND

### A.      Restrictions on Tobacco Use in South Dakota Prisons

The SDDOC operates six adult correctional facilities in the state of South Dakota.[4] Native Americans comprise twenty-seven percent of prisoners incarcerated in SDDOC facilities, which constitutes the highest concentration of Native American prisoners of any state prison population. Plaintiffs Blaine Brings Plenty and Clayton Creek are two Native American inmates who are members of Lakota[5] Sioux tribes and are currently incarcerated in South Dakota state prisons. Plaintiff NACT is a nonprofit organization run by Native American prisoners in the South Dakota State

---

[3]The Honorable Karen E. Schreier, then Chief Judge, United States District Court for the District of South Dakota.

[4]*Adult Corrections Facilities*, South Dakota Department of Corrections, http://doc.sd.gov/adult/facilities/.

[5]Creek and Brings Plenty are members of two of the sixteen modern day tribes that comprise the Great Sioux Nation, which "is a confederacy of historically and culturally united tribes" that are divided by dialects into three separate divisions: the Dakota, the Nakota, and the Lakota. *See* Steven J. Gunn, *Compacts, Confederacies, and Comity: Intertribal Enforcement of Tribal Court Orders*, 34 N.M. L. Rev. 297, 325 & n.18 (2004).

Penitentiary. NACT oversees Native American religious activities within SDDOC facilities.

Over the past sixteen years, the SDDOC has increasingly placed restrictions on the use of tobacco in its correctional facilities. The first restriction came in 1998 in the form of a smoking ban in South Dakota prisons. Douglas Weber, the former Director of Prison Operations, testified that the SDDOC adopted the smoking ban in part to alleviate health hazards related to second-hand smoke. Two years later, in 2000, the SDDOC also banned chewing tobacco in order to promote inmates' health and curb "issues with sanitation." However, the SDDOC continued to permit inmates' use of tobacco during Native American religious activities.

Despite these restrictions, problems with unauthorized use of tobacco persisted. In response, the SDDOC convened Native American spiritual leaders in October 2004 to discuss strategies to curb tobacco abuse. As a result of this meeting, the SDDOC decreased the amount of tobacco in the ceremonial mixture to fifty-percent tobacco and fifty-percent red willow bark, and decreased the quantity of mixture distributed to one-quarter cup. The SDDOC also prohibited inmates from storing tobacco in their cells and instead required them to store tobacco in locked boxes and retrieve it from prison staff prior to using it for religious activities.

In July of 2005, the SDDOC further reduced the amount of tobacco in the mixture to twenty-five percent and the quantity distributed to one-eighth cup. Prison staff also began grinding the mixture of tobacco and red willow bark to prevent inmates from extracting the tobacco from the mixture and using it for non-religious purposes. Additionally, NACT self-imposed a six-month ban on use of the tobacco mixture for inmates who violated tobacco policy.

On October 19, 2009, the SDDOC changed its policy to a complete ban on tobacco use, including tobacco use by inmates during Native American religious

activities.  The record includes two documents issued that same day.  First, in a letter to "Tribal Liaisons, Spiritual Leaders, Pipe Carriers, and Sundancers" announcing the ban, Weber emphasized that unauthorized tobacco use by inmates continues to be a problem in SDDOC correctional facilities.  He further explained:

> Medicine Men and Spiritual Leaders, who lead ceremonies at our facilities, have brought to our attention that tobacco is not traditional to the Lakota/Dakota ceremonies and that it is too addictive to be used for ceremonies.  They have requested that tobacco be removed from Native American Ceremonies so that the participants of these ceremonies will focus on their spiritual paths and not abusing the tobacco.
>
> Effective 10/19/09, the SDDOC will follow the advice of the respected Medicine Men and Spiritual Leaders and remove tobacco from Native American Ceremonies.

Second, Jennifer Wagner, then Cultural Activities Coordinator for the SDDOC, sent an email to prison staff stating, "Effective today, 10/19, tobacco is being removed from all Native American Ceremonies per the request of Medicine Men who lead ceremonies at our facilities."  In the event that inmates complained about the new policy, she advised staff to "remind [inmates] that we are honoring the request of the respected Medicine Men and are going back to their traditional ways."  This suit for injunctive relief challenges the defendants' most recent decision banning inmates' use of tobacco during Lakota religious activities.

## B.      Tobacco Use in the Lakota Religion[6]

At trial, Richard Bernard Moves Camp, a descendant of traditional Lakota healers and a traditional healer himself, testified to the importance of tobacco in the Lakota religion and described the various ways in which tobacco plays a central role in Lakota religious activities.  According to Moves Camp, the Lakota people use tobacco to make tobacco ties and prayer flags.  Tobacco ties are made with tobacco, string, and cloth, and are burned after they are offered.  Each tobacco tie represents a prayer.  Prayer flags are larger forms of a tobacco tie and are unique in that they each represent one of the four cardinal directions.  Moves Camp also explained that tobacco plays a central role in sweat lodge ceremonies, during which individuals sit around heated stones inside a covered lodge, sing songs, pass water, pray, and smoke the sacred pipe.  According to Moves Camp, a sweat lodge serves as "the anchor and the livelihood of a family to prayer."  Tobacco is also fundamental to pipe ceremonies.  Moves Camp stated that the "smoke is significant" and represents the spirit of all beings as well as the creation story.  Notably, Moves Camp testified that a mixture of tobacco and red willow bark that contains only "five percent or even one percent" tobacco would be appropriate for Lakota pipe ceremonies.

Moves Camp emphasized that "tobacco is a really important part of our culture and ceremonies."  He noted that "[t]obacco has been around the indigenous people for over a thousand years before the Europeans made contact with our people" and he described tobacco as the "center" of the Lakota way of life.  According to Moves Camp, those practicing the Lakota religion would have difficulty praying without tobacco.  He stated that depriving a Lakota person of tobacco would be "like taking a Bible away from the church."

---

[6]Although we acknowledge that "Lakota religion" may not be the best characterization of the inmates' beliefs, we use that term in light of RLUIPA's focus on the "religious" exercise of inmates. *See* 42 U.S.C. § 2000cc-1(a).

### C. Plaintiffs' Religious Beliefs

Creek and Brings Plenty also testified about their religious beliefs and agreed that Moves Camp's religious beliefs are consistent with their own.

#### a. Clayton Creek

Creek was born on the Cheyenne River Sioux Reservation and is an enrolled member of the Cheyenne River Sioux Tribe. At the time of trial, Creek was incarcerated at the Mike Durfee State Prison in Springfield, South Dakota. Creek testified that from a young age, he regularly used tobacco when practicing the Lakota religion. At the age of sixteen, Creek became a pipe carrier. A pipe carrier tends to the sacred pipe, which is an honorable duty passed down from generation to generation to those who exemplify knowledge of the significance and purpose of the pipe.

Prior to his incarceration, Creek used different pipe mixtures for different ceremonies. He used one-hundred percent tobacco for sweat lodge ceremonies, tobacco ties, and prayer flags, and a mixture of red willow bark and tobacco for pipe ceremonies. Creek testified that no relative or traditional healer has ever instructed him to smoke exclusively red willow bark.

Creek testified that "[t]obacco is essential to our belief. Tobacco is an offering. It's one of the greatest offerings we can give to our Higher Power. He gives us life, and he gives us what we have today. In return, we offer . . . tobacco." Since the tobacco ban took effect, Creek has continued to attend pipe ceremonies and sweat lodge ceremonies at the Mike Durfee State Prison. However, he testified that his "whole essential belief system has been taken" from him.

### b.     Blaine Brings Plenty

Brings Plenty was raised on the Pine Ridge Indian Reservation and is an enrolled member of the Oglala Sioux Tribe.  At the time of trial, he was incarcerated at the South Dakota State Penitentiary in Sioux Falls, South Dakota.  Brings Plenty testified that he has practiced the Lakota religion since childhood and has always used tobacco in Lakota religious ceremonies.  Brings Plenty emphasized the importance of tobacco in Lakota religious ceremonies, explaining that "the spirits take the smoke up to Tunkashila, the Wankan Tanka, the Great Mystery."

Brings Plenty has participated in the sweat lodge ceremony at the Penitentiary since his arrival in 1989.  He serves as a pipe carrier and a fire keeper.  As a fire keeper, he prepares the rocks prior to the sweat lodge ceremony, smudges the sweat lodge with sage, and puts tobacco into the fire pit.  Brings Plenty also guards the sweat lodge and works with Mary Montoya, a volunteer in the religious and cultural activities program at the Penitentiary, to ensure that the sweat lodge ceremony remains safe for all participants.

Brings Plenty explained that tobacco plays a central role in the practice of his religious beliefs.  He testified that when the tobacco ban took effect, he felt as though a part of him had been taken away.

### D.     Issues Presented

After considering the evidence at trial, the district court concluded that the defendants violated the inmates' rights under RLUIPA by banning the inmates' use of tobacco during Lakota religious activities.  The district court enjoined the SDDOC from banning tobacco and issued a remedial order governing the religious use of tobacco by inmates in South Dakota prisons.  The defendants filed a timely notice of appeal.  With respect to the inmates' RLUIPA claim, the defendants contend that the

district court erred by concluding (1) that the tobacco ban substantially burdened the inmates' exercise of their religion, (2) that the tobacco ban did not further the defendants' compelling government interest in maintaining prison security, and (3) that the tobacco ban was not the least restrictive means of achieving the defendants' interest in prison security. The defendants also argue that the district court erred by denying the admission of an exhibit detailing prison disciplinary proceedings against Native American inmates misusing tobacco in the prison system. Finally, the defendants contend that the district court's remedial order is not narrowly tailored to remedy the RLUIPA violation.

We turn to a discussion of these issues in the context of the aforementioned testimony presented at trial.[7]

## II. RLUIPA

We first address whether the defendants violated RLUIPA before turning to their remaining claims. We review the district court's "findings of fact for clear error and [its] legal rulings de novo." *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009).

It is well-accepted that "[p]rison inmates retain constitutional rights protected by the First Amendment, including the right to free exercise of religion." *Fegans v. Norris*, 537 F.3d 897, 902 (8th Cir. 2008). Despite this promise, the prison context is one "where it is so easy for governmental officials with so much power over inmates' lives to deny capriciously one more liberty to those who have already forfeited so many others." *Yellowbear v. Lampert*, 741 F.3d 48, 53 (10th Cir. 2014) (citing Douglas Laycock & Luke W. Goodrich, *RLUIPA: Necessary, Modest, and*

---

[7]We summarize the relevant contrary testimony offered by the defendants during our discussion of the merits of the inmates' RLUIPA claim. *See infra* Part II.

*Under-Enforced*, 39 Fordham Urb. L.J. 1021, 1021, 1025-41 (2012)).  Congress granted additional protection for religious exercise by institutionalized persons through the enactment of RLUIPA.  *See Fegans*, 537 F.3d at 902.

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise" of an inmate unless the government demonstrates that the imposition of the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a)(1)-(2) ("Section 3"); *see Van Wyhe v. Reisch*, 581 F.3d 639, 654 (8th Cir. 2009) (explaining that RLUIPA "prohibits substantial burdens on religious exercise, without regard to discriminatory intent").  Section 3 of RLUIPA limits protection to circumstances in which "the substantial burden is imposed in a program or activity that receives Federal financial assistance."  42 U.S.C. § 2000cc-1(b)(1).  RLUIPA defines "religious exercise" broadly as including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Id.* § 2000cc-5(7)(A).

Inmates retain a private cause of action to enforce RLUIPA protections.  *See id.* § 2000cc-2(a) (explaining that "[a] person may assert a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government").  To succeed on such a claim, an inmate must initially produce "prima facie evidence" that the challenged government practice "substantially burdens [his] exercise of religion."  *Id.* § 2000cc-2(b).  If the inmate produces such evidence, the burden shifts to the government to prove every other element of the claim (i.e. that its practice furthers a compelling government interest and there are no less restrictive means of furthering that interest).  *Id.*

## A.  The Inmates' Burden

As noted, "[t]o make out a prima facie RLUIPA claim against a state official, an inmate must show, as a threshold matter, that there is a substantial burden on his ability to exercise his religion."  *Van Wyhe*, 581 F.3d at 655 (citation omitted) (internal quotation marks omitted).  In essence, an inmate must carry two discrete burdens.  The inmate must show that the government's practice imposes (1) a substantial burden (2) on a *religious* exercise. *See Murphy v. Mo. Dep't of Corr.*, 506 F.3d 1111, 1115 (8th Cir. 2007) (emphasis added) ("[T]he existence of a sincerely held tenet or belief that is central or fundamental to an individual's religion is a prerequisite to a 'substantially burdened' claim under RLUIPA.")  Here, the district court determined that the inmates' use of tobacco during Lakota ceremonies satisfies the definition of a "religious exercise" under RLUIPA.  Indeed, the inmates' testimony illuminates the importance of tobacco to the exercise of their religious beliefs—beliefs that began from a young age and have continued throughout adulthood.  Moreover, the defendants do not dispute that the inmates' use of tobacco during Lakota ceremonies satisfies RLUIPA's definition of "religious exercise."  The evidence in the record and the findings of the district court demonstrate that the inmates' have satisfied their burden of showing that their use of tobacco constitutes a "religious exercise" under RLUIPA.

The inmates must also establish that the tobacco ban substantially burdens the exercise of their religious beliefs in the prison system.  *See* 42 U.S.C. § 2000cc-1(a).

> In order for a government practice to substantially burden a religious exercise, it must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2007) (citation omitted) (internal quotation marks omitted).

The inmates testified that since childhood, the use of tobacco has played an important role in their religious practices. This testimony underscores the significant burden that the tobacco ban has placed on the exercise of their religious beliefs. We emphasize some of the important evidence. Brings Plenty testified that he felt as though a part of him had been taken away when the tobacco ban took effect. Creek similarly testified that the tobacco ban stripped him of his "whole essential belief system." This testimony is consistent with that of Moves Camp who described tobacco as the "center" of the Lakota way of life. The record shows that the tobacco ban has "meaningfully curtail[ed] [the inmates'] ability to express adherence to [their] faith." *Id*.

In opposition, the defendants contend that the tobacco ban cannot substantially burden the inmates' religious exercise because tobacco can be replaced by red willow bark—a readily-available traditional alternative to tobacco. We reject the defendants' invitation to define the contours of the inmates' religious beliefs. By claiming that tobacco can be easily replaced by red willow bark, the defendants urge us to weigh the importance of tobacco vis-à-vis other substances in the Lakota religion. As the amicus United States observes, this type of inquiry into what is or is not central to a particular religion has no place in an RLUIPA analysis. *See* 42 U.S.C. § 2000cc–5(7)(A) (defining "religious exercise" as "any exercise of religion, *whether or not compelled by, or central to*, a system of religious belief" (emphasis added)); *see also Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."). Furthermore, we have consistently said that in the context of a RLUIPA claim, "[n]o 'doctrinal justification' is required to support the religious practice allegedly infringed." *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 833 (8th Cir. 2009).

Therefore, that some Native Americans practicing the Lakota religion would consider red willow bark a sufficient alternative to tobacco does not undermine the decision of the district court.

The defendants also contend that our unpublished decision *Runningbird v. Weber* supports their position. 198 Fed. App'x 576 (8th Cir. 2006). We disagree. In *Runningbird*, we concluded that the South Dakota State Penitentiary's tobacco restrictions, including its limitation on the amount of tobacco disbursed, did not substantially burden the inmates' religious exercise in violation of RLUIPA. *Id.* at 578-79. But the policy at issue in *Runningbird* limited tobacco use and did not *ban* it. *See Runningbird v. Weber*, No. Civ. 03-4018-RHB, 2005 WL 1363927, at *2-3 (D. S.D. June 8, 2005). That critical distinction undercuts any persuasive support that *Runningbird* may have with respect to the case at hand. Thus, as the district court correctly observed, *Runningbird* does not offer persuasive support for the defendants' assertion that they have not substantially burdened the inmates' exercise of their religious beliefs.

We conclude that the record amply shows that the inmates have satisfied their burden. *See* 42 U.S.C. § 2000cc-2(b). Accordingly, the inmates will prevail on their RLUIPA claim unless the defendants can show that the tobacco ban "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)-(2), -2(b).

### B.    Compelling Government Interest

At trial, the defendants asserted that they banned tobacco to further their compelling government interest in promoting order and security within SDDOC prisons. Indeed, we have stated that "[a] prison's interest in order and security is always compelling." *Fowler v. Crawford*, 534 F.3d 931, 939 (8th Cir. 2008).

However, after considering the evidence presented at trial, the district court found that the defendants implemented the tobacco ban "to effectuate what [they] believed was the advice of the medicine men and spiritual leaders regarding the Lakota religion rather than due to security reasons" in order to enforce "what they determined to be the more 'traditional' Lakota belief." Accordingly, the district court concluded that the defendants did not satisfy their burden of showing that they banned tobacco in furtherance of a compelling government interest.

While we acknowledge that the prison administrators' expertise must be given deference, *see Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005), we need not decide whether the defendants banned tobacco in furtherance of a compelling government interest in order and security because even if we assume they did, a ban on tobacco use is not the least restrictive means of achieving that interest.[8]

## C.    Least Restrictive Means

To defeat the inmates RLUIPA claim, the defendants must show that the tobacco ban was the "the least restrictive means of furthering [their] compelling governmental interest" in order and security.  42 U.S.C. § 2000cc-1(a)(2).  In order to satisfy this burden, the defendants must come forward with specific evidence of no

---

[8]Because the defendants cannot show that they employed the least restrictive means of furthering their interest, *see infra* Part II(c), we may dispose of their evidentiary claim.  The defendants argue that the district court abused its discretion by denying their request to introduce disciplinary reports of Native American inmates that NACT had banned from using tobacco due to rule violations.  But the defendants concede that the reports are only relevant to the question of whether they banned tobacco in furtherance of a compelling government interest.  Therefore, because the resolution of the defendants' RLUIPA claims does not turn on the compelling-interest prong, we need not address this evidentiary question.

less restrictive means available. *Murphy v. Miss. Dep't of Corr.*, 372 F.3d 979, 989 (8th Cir. 2004). The defendants have failed to satisfy their burden on this issue.

The inmates and Moves Camp discussed several alternatives to banning tobacco that could be implemented to alleviate tobacco abuse. Those alternatives include (1) limiting those who can construct tobacco ties and prayer flags to pipe carriers and fire keepers; (2) mandating that prison staff or volunteers transport tobacco ties, prayer flags, and tobacco pipe mixture to the site of their religious ceremonies; (3) burning the tobacco immediately after use; (4) implementing additional security measures, such as searches after a sweat lodge ceremony, and more severe penalties for misusing tobacco, such as cell restriction, disciplinary segregation or administrative segregation; and (5) decreasing the amount of the tobacco in the mixture to as low as one to five percent.

At trial, Weber rejected each of the alternatives as ineffective or unfeasible. But other than Weber testifying that some of the alternatives were "talked about," the defendants offered no evidence that they meaningfully considered any of the alternatives or tested the effectiveness of such alternatives before effectuating the tobacco ban. *See id.*; *see also Yellowbear*, 741 F.3d at 63 ("[T]he government's burden here isn't to *mull* the claimant's proposed alternatives, it is to *demonstrate* the claimant's alternatives are ineffective to achieve the government's stated goals."); *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005) (explaining that the government "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice").

Perhaps most damaging to the defendants' position is the absence of any evidence that they seriously considered a further decrease in the *amount* of tobacco in the mixture as a less restrictive strategy of quelling tobacco abuse. At trial, Moves Camp testified that the tobacco mixture used in Lakota religious ceremonies could

-15-

contain as little as one-percent tobacco, and the inmates testified that Moves Camp's religious beliefs are consistent with their own. Thus, the district court correctly found that in assessing less restrictive means, "[i]t is not the amount of tobacco, but rather the fact that tobacco is present in the ceremonies, that is important."

At trial, Weber rejected the effectiveness of a further decrease in the amount of tobacco distributed to inmates, explaining that "whether it's 25 percent or 10 percent or 5 percent, it's still tobacco, and it's still a sought-after commodity." But if the SDDOC continued to decrease the proportion of tobacco in the mixture, there would be a point at which the amount of tobacco in the mixture would be so insignificant that it would be neither practical nor profitable to extract it. At this point, the defendants can achieve their interest in order and security while also accommodating the inmates' desire for the presence of tobacco during religious ceremonies. Simply put, the defendants have failed to meaningfully explain how decreasing the proportion of tobacco in the mixture to no more than one-percent—a measure that is less restrictive than an outright ban—would not be an effective means of curbing tobacco abuse and, as a result, achieving their interest in order and security.

Further, that other correctional facilities permit inmates to use tobacco for religious purposes supports the existence of less restrictive means of ensuring order and security in prisons. *Fegans*, 537 F.3d at 905 (explaining that "prison policies from other jurisdictions provide some evidence as to the feasibility of implementing a less restrictive means of achieving prison safety and security" (citation omitted) (internal quotation marks omitted)). Indeed, the district court cited extensive evidence demonstrating that numerous correctional facilities throughout the United States permit inmates to use tobacco for religious purposes subject to various limitations. It's true that what other prisons have done to accommodate inmates' religious tobacco use may deserve less weight here given South Dakota's higher percentage of Native American inmates compared to other states. *See Fowler*, 534

F.3d at 942 (noting that "as prisons differ, so may the means by which prison officials ensure order and stability"). Nevertheless, we agree with the district court's observation that "widespread allowance of tobacco in prison lends substantial credence to [the inmates'] position that less restrictive alternatives to a complete ban on the use of tobacco in Lakota religious ceremonies [are] possible."

We conclude that the record supports the district court's determination that the defendants have not satisfied their burden of showing that the tobacco ban "is the least restrictive means of furthering their compelling government interest." 42 U.S.C. § 2000cc-1(a)(2). Accordingly, we affirm the district court's conclusion that the defendants violated RLUIPA by banning inmates' use of tobacco for religious purposes.

## III. The Remedial Order

After concluding that the defendants violated RLUIPA, the district court ordered the parties to meet, confer, and adopt a narrowly tailored tobacco policy. When the parties failed to agree on a revised policy, each party submitted proposed policies to the district court. After reviewing these submissions, the district court issued a remedial order[9] enjoining the defendants from banning tobacco during Native

---

[9]In its remedial order, the district court mandated the following policies and procedures to cure the RLUIPA violation:

1.  Mixtures used during Native American ceremonies that include tobacco will not contain more than 1 percent tobacco by volume.

    . . . .

2.  Tobacco ties and prayer flags can contain mixtures that include tobacco. All tobacco ties and prayer flags used during ceremonies must be burned at the conclusion of the ceremonies.

    . . . .

-17-

3.      The mixtures used for tobacco ties and prayer flags must be ground, but the mixtures that are smoked in pipes do not need to be ground.

. . . .

4.      The mixtures used during ceremonies will be provided by volunteers who are cleared by the [SDDOC]. The volunteers must be eligible for and receive a 'pink tag' or some equivalent clearance level. Volunteers who violate the tobacco policy may be refused admission to any [SDDOC] facility and may be subject to prosecution.

. . . .

5.      Mixtures provided by the approved volunteers must be brought into the facility in a sealed, clear plastic bag that is subject to search and marked for identification. Mixtures must be premixed to comply with the 1 percent tobacco by volume requirement.

. . . .

6.      Each [SDDOC] facility will determine where ceremonies take place within the facility, including the locations where tobacco ties and prayer flags are made. The [SDDOC] may require certain activities that involve tobacco to take place under video surveillance. The video surveillance requirement does not apply to the sweat lodge ceremony.

. . . .

7.      Inmates participating in the Native American religion can participate in the making of tobacco ties and prayer flags.

. . . .

8.      The process for handling and distributing tobacco ties and prayer flags will revert back to the procedures used prior to the tobacco ban.

. . . .

9.      An abuse of ceremonial tobacco by an inmate will result in a one-year suspension from any ceremony that includes tobacco.

(Order at 3-9) (footnote omitted). The district court also ordered that "[a]ll other procedures and processes should revert back to the manner in which they were done

-18-

American religious ceremonies. The order also required the SDDOC to amend its tobacco policy in various ways to ensure that inmates participating in Native American religious ceremonies are afforded the opportunity to use tobacco during ceremonies. On appeal, the defendants argue that the district court failed to narrowly tailor the remedial order in violation of the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(a)(1)(A).

The PLRA "'limits remedies to those necessary to remedy the proven violation of federal rights.'" *Tyler v. Murphy*, 135 F.3d 594, 596 (8th Cir. 1998) (quoting H.R. Rep. No. 104–21, at 24 n. 2 (1995)). The PLRA provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A). This language requires that "[t]he scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation." *Brown v. Plata*, __ U.S. __, __, 131 S. Ct. 1910, 1940 (2011). "Narrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends." *Id.* at __, 131 S. Ct. at 1939 (citation omitted) (internal quotation marks omitted) (alteration omitted). In determining whether these requirements are met, the court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a)(1)(A).

---

prior to the tobacco ban and consistent with this order." (Order at 9).

After a thorough review of the record and the arguments presented by the defendants, we conclude that the scope of the district court's remedial order extends no further than necessary to remedy the violation of inmates' rights under RLUIPA. *See Plata*, __ U.S. at __, 131 S. Ct. at 1940. In fashioning the remedial order, the district court carefully balanced the need to fairly accommodate inmates' exercise of their religion, taking into account the parties' proposed remedies, while giving due "weight to any adverse impact on public safety or the operation of a criminal justice system" that may result from a change in tobacco policy. *See* 18 U.S.C. § 3626(a)(1)(A). Accordingly, we conclude that the district court's remedial order does not violate the PLRA.[10]

## IV. Conclusion

We affirm the district court's grant of injunctive relief in all respects, including its remedial order.

———————————————————

---

[10]In affirming the district court's remedial order, we in no way foreclose future modification and amendment of that order. The district court "must remain open to a showing or demonstration by either party that the injunction should be altered to ensure that the rights and interests of the parties are given all due and necessary protection." *Plata*, __ U.S. at __, 131 S. Ct. at 1946; *see* 18 U.S.C. § 3626(b)(4).